**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

E.A. HAWSE HEALTH CENTER, et al.

       Plaintiffs,

v.                        CIVIL ACTION NO.  2:11-cv-00062

BUREAU OF MEDICAL SERVICES,
DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
STATE OF WEST VIRGINIA, et al.

       Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are the plaintiffs' Motion for Preliminary Injunction [Docket 8],

the defendants' Motion to Dismiss the complaint for lack of subject matter jurisdiction [Docket 40],

and the plaintiffs' Motions for Leave to Amend the complaint [Dockets 58, 66].  On April 1, 2011,

the Court heard the parties on the former two motions.  Briefing has concluded, and the motions are

ripe for the Court's review.

*I.  FACTUAL BACKGROUND & PROCEDURAL HISTORY*

A.    *Background and BIPA PPS Floor*

The plaintiffs in this case are seven federally-qualified health centers providing an array of

medical services to poor residents of West Virginia (hereinafter "Plaintiffs").  Plaintiffs operate as

community health centers under the Public Service Act ("PSA"), 42 U.S.C. § 254b, and they receive

federal grant funds under the PSA for serving a population that is medically under-served.  The PSA

requires that recipient health centers provide care to Medicaid enrollees and to any patient regardless of ability to pay. *See id.* § 254b(k)(3)(E)&(G).

In general terms, the federal Medicaid program provides funds to States that choose to participate in the program. Once a State opts to participate in Medicaid, it must adhere to an intricate set of federal laws prescribing, among other things, reimbursement to providers who furnish services to Medicaid enrollees. One such requirement is that a State Medicaid Plan provide payment for services rendered by "federally-qualified health centers" (FQHC). *See* 42 U.S.C. § 1396a(a)(15); *id.* § 1396d(a)(2)(C); *id.* § 1396d(*l*)(2). FQHCs are defined, in part, as health centers that receive or meet the requirements for receiving PSA grants, *id.* § 1396(*l*)(2), and Plaintiffs are therefore all FQHCs.

Until 2000, the federal Medicaid program required States to reimburse FQHCs for "100 percent . . . of [each FQHC's] costs which are reasonable." 42 U.S.C. § 1396a(a)(13)(C) (repealed 2000). The purpose of this requirement was "to ensure that health centers receiving [PSA grants] would not have to divert [grant] funds to cover the cost of serving Medicaid patients." *Three Lower Counties Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 297-98 (4th Cir. 2007) (quoting H.R. Rep. No. 101-247, *reprinted in* 1989 U.S.C.C.A.N. 1906, 2118-19). In other words, Congress intended Medicaid to stand on its own. To continue that purpose and to allow FQHCs to avoid providing new cost data every year, Congress enacted the "BIPA PPS system" in 2000,[1] a prospective payment system based on the historical costs of providing Medicaid services trended forward according to a set inflation factor.

---

[1] Part of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA").

2

In particular, this new prospective payment system, which began with fiscal year 2001, requires State Medicaid Plans to "provide for payment for such services described in section 1396d(a)(2)(C) of this title furnished by [an FQHC] . . . in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable." 42 U.S.C. § 1396a(bb)(1)&(2). That is, under the new system, each health center's reasonable costs of providing Medicaid services for the years 1999 and 2000 were to be added together, and the sum divided by the total number of visits by Medicaid patients in those two years to obtain an average per-visit cost rate. This average per-visit rate for the years 1999 and 2000 becomes the baseline per-visit rate to be applied in all future years, adjusted by a cost-of-living index (the Medicare Economic Index or "MEI") and any change in the scope of services provided by the FQHC.[2] *See* 42 U.S.C. § 1396a(bb)(2)-(3).

Thus, to calculate an FQHC's Medicaid payment for fiscal year 2001 and each fiscal year thereafter, the average per-visit cost rate calculated for 1999 and 2000 is multiplied by the number of visits made by Medicaid patients in the applicable fiscal year (2001 or later), adjusted by the MEI and for any change in scope of services.  While a health center's costs for servicing Medicaid enrollees is no longer audited every year, health centers must still submit new *visit* data for each year.  West Virginia has the responsibility to ensure full payment in accordance with federal law, which is guaranteed to meet or exceed the FQHCs' BIPA PPS rates.  *See generally* 42 U.S.C. § 1396a(bb).  This entails appropriately calculating the 1999 and 2000 BIPA PPS rate for each center,

---

[2]  Any change in the scope of services provided by a health center will necessarily alter the overall cost of providing health services to a given population.  In as far as the per-visit rate is designed to approximate a health center's reasonable costs, any changes in scope of services provided are necessary considerations.

applying the inflation factor, adjusting for any change in scope of services, and multiplying that figure by the number of qualifying visits in a given year.

      B.     *Medicare and Medicaid Compared*

As the parties point out, it is important to this litigation to recognize that Medicare and Medicaid cover different services rendered by FQHCs, and the two programs reimburse in different manners. The differences are largely attributable to the fact that, generally speaking, Medicare serves the elderly and disabled, and Medicaid serves the impoverished. As relevant to this case, Medicare covers only "FQHC core services,"[3] whereas Medicaid covers "FQHC core services" as well as "other ambulatory services" contained in a State's Medicaid Plan.

Generally, Medicare pays FQHCs an all-inclusive per visit payment based on reasonable costs as reported on the FQHC's annual cost report. This is a retrospective reimbursement system similar to the pre-2000 Medicaid system, whereby an intermediary estimates a health center's Medicare-covered costs for the past month and makes an interim payment that approximates covered costs. At the conclusion of the fiscal year, the actual allowable costs are tallied, and a true cost per visit rate is determined. Then, the State agency (or the fiscal intermediary) engages the health center in a final cost settlement. If the interim payments resulted in a figure lower than the health center's actual allowable costs for the year, BMS pays the difference; if the interim payments overpaid the

---

[3] This is a term both parties use in their briefing, and the Court will also utilize it. Federal Medicaid law requires States to reimburse for "[FQHC] services . . . and any other ambulatory services offered by a [FQHC] and which are otherwise included in the [State] plan." 42 U.S.C. § 1396d($l$)(2); *see also id.* § 1396a(bb)(1) (referring to § 1396d($l$)(2)). It is the former of the two categories of reimbursable services contained in § 1396d($l$)(2) to which the term "FQHC core services" refers. For the sake of clarity, "FQHC services" (referred to hereafter as "FQHC core services"), as used in § 1396d($l$)(2), is defined as those services provided by a physician, a physician assistant or nurse practitioner, or a clinical psychologist or clinical social worker, as well as such services and supplies furnished incidental to the other listed services. *See* 42 U.S.C. § 1395x(aa)(1).

health center, then BMS in entitled to a refund of the difference.  As relevant to this litigation, Medicare's FQHC program reimburses (at an all-inclusive, per-visit rate) for the cost of providing "FQHC core services" only, 42 U.S.C. § 1395k(a)(2)(D)(ii), which are defined as: (1) physicians' services and incidental services and supplies, *id.* § 1395x(aa)(3)(A); (2) services furnished by a physician assistant, nurse practitioner, clinical psychologist, or clinical social worker and incidental services and supplies, *id.* § 1395x(aa)(3)(B); and (3) intermittent nursing care and home supplies in certain circumstances, *id.* § 1395x(aa)(3)(C).

Medicaid, on the other hand, requires reimbursement to FQHCs for "FQHC core services" as well as "other ambulatory services" offered by an FQHC and included in the State Medicaid Plan. The scope of services reimbursed by Medicaid is broader, and therefore, if a State reimburses according to the BIPA PPS rate in federal law, an FQHC's Medicaid PPS rate will be higher than its Medicare per-visit rate (provided, of course, that the FQHC actually renders any "other ambulatory services" and the State covers those services in its Medicaid Plan).  Even if a State reimburses FQHCs under an alternative methodology, *see infra*, it must still reimburse for a broader scope of services under Medicaid, and the State must ensure that it is reimbursing the FQHC at least what it would have received using the all-inclusive BIPA PPS rate.  *See* 42 U.S.C. § 1396a(bb)(6).

### C. *Alternative Payment Methodology*

In addition to setting forth the BIPA PPS rate, federal law also permits States and FQHCs to "contract around" the BIPA PPS reimbursement system provided two requirements are met: (1) both the State and the FQHC agree to whatever alternate payment methodology ("APM") is used; and (2) the APM "results in payment to the center or clinic of an amount which is at least equal to the amount otherwise required to be paid to the center or clinic" under the PPS methodology.  42

U.S.C. § 1396a(bb)(6).  West Virginia's APM is contained in the State Medicaid Plan, and it states

that the APM "is agreed to by the State and centers/clinics and results in payment to the center/clinic

of an amount that is at least equal to [the amount to] be paid to the center or clinic" under the BIPA

PPS methodology.  (Docket 11-13 at 2.)  The APM further provides that FQHCs will receive

monthly interim payments "calculated on a per visit basis and set at an amount which will

reasonably approximate the estimated costs of providing covered services to Medicaid recipients."

A provider's interim rate may be set based upon "a current Medicare rate, a submitted Medicare or

Medicaid annual cost report, an interim cost report with supporting documentation, a Medicare

settled cost report, or Medicaid cost reimbursement methodology."  (*Id.*)  At the conclusion of a

fiscal year, "[f]inal settlement will be made based upon a provider's cost report filed and settled in

accordance with Medicare regulations as applied to the Medicaid program."  (*Id.*)  The West

Virginia  Medicaid Provider Manual provides more detail, stating that under the APM, FQHCs are

reimbursed "based on an all-inclusive per visit rate as determined by the Medicare fiscal

intermediary." (Docket 11-11 at 6.)  The Provider Manual further states that "[a]mbulatory services

not included in the encounter rate and covered by the West Virginia Medicaid State Plan are

reimbursed at the rate set for each service."  (*Id.*)  Thus, the West Virginia APM provides for

monthly interim payments to FQHCs for their "FQHC core services," which are the same for

Medicare and Medicaid and can be found on a health center's Medicare cost report.  As for "other

ambulatory services" contained in the State Medicaid Plan, West Virginia's APM reimburses on a

fee-for-service basis, as it does for all Medicaid providers.  These payments to FQHCs are subject

to year-end reconciliation under the APM, where, presumably, an FQHC's total reimbursement will

be compared to its BIPA PPS rate, as appropriately calculated and applied to the annual visit count.

D.      *Plaintiffs' Claims*

(1)      *Count I: Failure to Properly Calculate the BIPA PPS Rate*

Plaintiffs first allege that West Virginia never properly calculated their BIPA PPS rates, which is required whether West Virginia utilizes the PPS methodology or opts to employ its own APM, since the State must ensure that reimbursement to FQHCs is greater than or equal to the centers' BIPA PPS rates in either case.  According to Plaintiffs, West Virginia simply uses the FQHCs' Medicare per-visit rate from submitted Medicare cost reports, thereby omitting all "other ambulatory services" provided in the State Plan from the per-visit rate it pays.  Without a properly calculated PPS rate, argue the plaintiffs, statutory reimbursement cannot be and has not been assured.

(2)      *Count II: Failure to Properly Implement the APM*

Plaintiffs also allege that West Virginia has never properly implemented the APM because: (1) the State never secured the FQHCs' consent to use an APM rather than the BIPA PPS rates; and (2) the State imposes the Medicare "cap" and "screen"[4] on the per-visit rate it uses to pay FQHCs for "FQHC core services."  Furthermore, the plaintiffs allege that West Virginia has failed to engage them in final cost settlements for a number of years, allegedly since 2001.  (*See* Docket 1 at 41.)

(3)      *Count III: Failure to Implement a Change in Scope Mechanism*

As explained above, federal law provides that once an FQHC's BIPA PPS rate has been calculated for 2001, it must be inflated by a specified inflation factor (MEI) and then altered to take

---

[4]  In short, the Medicare cap establishes a ceiling per-visit rate that may not be exceeded by an FQHC.  The Medicare screen imposes a minimum number of annual visits on an FQHC.  The result of the minimum visit count is to artificially depress the per-visit rate if an FQHC's visit count falls below the screen.  Both the cap and screen are cost containment mechanisms that exist in federal Medicare law.

into account any change in scope of services an FQHC undergoes.  The purpose of this latter requirement is to ensure that the FQHC is receiving reimbursement that reasonably approximates its costs.  Plaintiffs allege that West Virginia has never devised or implemented a mechanism for FQHCs to affect a change in scope of services.  Plaintiffs allege that there is no description of how West Virginia will account for a change in scope of services in the State Plan, provider manual, or elsewhere.

### (4)	Count IV: Failure to Pay Full Rates for Dental Visits

Plaintiffs further allege that reimbursement for dental visits must be included in either the PPS or APM per-visit rates, and that they cannot be reimbursed on a fee for service basis, as West Virginia currently does.

### (5)	Count V: Failure to Pay Full Rates for Behavioral Health Visits

Count V alleges that West Virginia pays Plaintiffs for behavioral health visits at 62.5% of "the current per-visit rate."[5]  The balance of the rate is paid at final cost settlement, which takes place years after the fact, according to Plaintiffs.  Furthermore, argue Plaintiffs, West Virginia limits covered behavioral health visits to ten per year, without any authority to do so.

### (6)	Count VI: Failure to Develop Method for Determining New FQHCs' Rates

For FQHCs that are first established after the initial BIPA PPS rates were calculated in 2001, States are obligated "to provide for payment for [FQHC and other ambulatory services] furnished by the center . . . in an amount (calculated on a per visit basis) that is equal to 100 percent of the costs of furnishing services . . . based on the rates established under this subsection for the fiscal

---

[5]  This presumably refers to the per-visit rate West Virginia pays to FQHCs based on the cost of providing "FQHC core services" derived from the centers' Medicare cost reports.

year for other such centers or clinics located in the same or adjacent area with a similar case load."

42 U.S.C. § 1396a(bb)(4).  Plaintiffs allege that West Virginia has never devised or implemented

such a plan.

*(7)     Count VII: MCO Wrap-Around Payments are Insufficient*

Federal law requires that if a State contracts with managed care organizations ("MCOs") to

pay Medicaid providers, the State is responsible for any shortfall between the amount paid to the

centers under the MCO contract and BIPA PPS floor payment to which each FQHC is entitled.  *See*

42 U.S.C. § 1396a(bb)(5).  West Virginia's State Plan states that MCOs must pay FQHCs according

to the APM, and therefore no shortfall will result and the State will never be required to make any

MCO "wrap-around payments."  In Count VII, Plaintiffs allege that because the APM fails to ensure

FQHCs are receiving their BIPA PPS rates (for all the reasons set forth above), the MCO payments

are deficient, and the State is responsible for making a supplemental payment equal to the difference

between the actual payments received by MCOs and their BIPA PPS rates.

*(8)     Count VIII:  Violation of Dual Eligible Payment Requirements*

Plaintiffs finally allege that West Virginia fails to pay as required by federal law for

individuals eligible for both Medicare and Medicaid ("dual eligibles").   The complaint alleges that

Medicaid law dictates that Medicare is the primary payor, usually responsible for approximately

eighty percent of the cost of rendering a covered service.  The remaining amount, which is usually

a co-insurance payment, is then submitted to Medicaid for payment.  According to Count VIII, West

Virginia's Medicaid payment for dual eligibles is deficient and contrary to federal law.

E.      *Procedural Posture*

Plaintiffs filed their complaint pursuant to 42 U.S.C. § 1983 on January 26, 2011, and they filed a motion for preliminary injunction the next day.  (Docket 1, 8.)  The named defendants are the Bureau of Medical Services, a component agency of the West Virginia Department of Health and Human Resources and the agency primarily tasked with handling the Medicaid issues presented by this case, and Nancy Adkins, the Commissioner of BMS (together referred to as "BMS"). On March 9, 2011, BMS filed a motion to dismiss the complaint for lack of subject matter jurisdiction.  BMS argues that the dispute is not ripe and that the Eleventh Amendment bars certain relief that Plaintiffs seek. Plaintiffs filed a motion to amend the complaint on April 15, 2011, the main purpose of which is to strike the portion of the prayer dealing with retroactive money damages.  This is the portion of the complaint that BMS argues violates the Eleventh Amendment.

The parties have been engaged in failed negotiations for a number of years.  This litigation was finally initiated when BMS sent Plaintiffs an election letter, seeking a decision from them as to whether they would prefer to be reimbursed under the BIPA PPS method or under the APM as set forth in the State Plan.  Plaintiffs view West Virginia's implementation of both methods as contrary to law and insufficient, so they filed this lawsuit.

## II. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

A.      *Ripeness*

BMS first argues that the matters in this case are not ripe for judicial review because no final agency action has been taken.  BMS points to the election letters as the agency action in this case and states that the parties could still engage in final cost settlement once an election is made and ultimately avoid litigation altogether.  (Docket 41 at 12-13.)  Plaintiffs respond that it is not the

election letters they challenge in this suit, but rather BMS's failure to adhere to federal law for nearly a decade. (Docket 53 at 29-30.)  Furthermore, at the hearing on these motions, Plaintiffs stated that no appeal regarding the calculation of individual health centers' BIPA PPS rates is available in the state system because BMS has never engaged in final cost settlement, as required under the APM in the State Plan.

Federal courts are constitutionally empowered to hear only live cases and controversies pursuant to Article III of the United States Constitution.  The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.  *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 114 (1976) (per curiam).  The Supreme Court has stated that the presumption of available judicial review is subject to an implicit limitation: "injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967); *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 (1993).  The Supreme Court described a ripe controversy as one in which "the effects of the administrative action challenged have been 'felt in a concrete way by the challenging parties.'"  *Reno*, 509 U.S. at 57 (quoting *Abbott Labs.*, 387 U.S. at 148-49).  The basic rationale behind ripeness is

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Labs.*, 387 U.S. at 148-49.  In assessing whether a case is ripe, the district court is to determine "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Id.* at 149.  "A case is fit for judicial decision when the issues are

11

purely legal and when the action in controversy is final and not dependent on future uncertainties or intervening agency rulings." *Miller v. Brown*, 462 F.3d 312, 318 (4th Cir. 2006). The hardship prong is measured "by the immediacy of the threat and the burden imposed on the petitioner." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992) (citing *Abbott Labs.*, 387 U.S. at 149, 153).

Plaintiffs heavily rely on *Virginia Hospital Ass'n v. Baliles (VHA)*, 868 F.2d 653 (4th Cir. 1989), as a closely analogous case. The plaintiffs in *VHA* were FQHCs throughout Virginia who sought a mandatory injunction and a declaration that the Virginia State Plan violated the Medicaid Act because "the procedures Virginia uses to determine what rate of reimbursement [FQHCs] receive for treating Medicaid patients" was inadequate and unlawful. *Id.* at 656. The *VHA* defendants filed a motion to dismiss the complaint, arguing that the district court lack subject matter jurisdiction because the claims were not ripe. The Fourth Circuit summarized the district court ruling and affirmed it as follows:

> The district court determined that VHA's claims were ripe as essentially products of final agency action and because of the hardship delay would produce. The Court found the Virginia plan to have operated for several years, making its enforcement not a matter of speculation. VHA's claim of deficient reimbursement rates presents a purely legal issue. Because VHA challenged the system and not individual providers' reimbursement rates, the court found inapposite Virginia's contention that providers should first have to appeal through the plan's administrative apparatus.
> . . .
> In this case, VHA has levied a challenge to a system that has operated for some years and the products of which, the reimbursement rates, VHA believes inadequate. Although no VHA member hospital has prosecuted its case through the administrative appeal mechanism, this mechanism is also the subject of VHA's challenge. VHA has framed its suit as a denial of the legitimacy of the entire Virginia plan. We think the district court was correct to hold that the effects of this system are now sufficiently clear to defeat an argument that VHA's suit is premature.

*Id.* at 663-64.

12

BMS has presented no compelling reason that the Court should not follow the holding in *VHA*. Like the plaintiffs in *VHA*, these plaintiffs are challenging the manner in which BMS implements the West Virginia State Medicaid Plan and whether that implementation comports with federal law. Plaintiffs are not arguing that, for example, a particular FQHC provided podiatry services during the month of December, and BMS failed to include that service in the per-visit reimbursement. A dispute of that nature must be handled in the administrative process first; in contrast, the issues in this case are of a more purely legal nature.

### (1)    Final Agency Action

BMS argues that the case is not ripe for three reasons, two of which are loosely based on the Supreme Court's *Abbott Labs.* decision. First, BMS states that "the agency action [the January 4, 2011, election letter] is not final," and therefore "[a] possibility exists that the cost reports will be settled at final cost settlement, thus, mooting [the plaintiffs'] claims."[6]   In other words, BMS argues that the PPS rates shared with the FQHCs are subject to change, as are any determinations of reasonableness for services rendered. As Plaintiffs point out, however, it is not the election letter that they are primarily challenging (although Plaintiffs also challenge the notion of a one-time election between PPS and APM reimbursement contained in the election letter). Instead, Plaintiffs are challenging the manner in which West Virginia reimburses FQHCs more broadly, and they allege that federal law requires more of the State.

---

[6] This argument is derived from the *Abbott Labs.* prong that requires a case to be fit for judicial decision. "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties or intervening agency rulings." *Miller v. Brown*, 462 F.3d at 318.

Furthermore, at the motions hearing, it was stated that final cost settlement has not taken place since at least 2003, making BMS's cost-settlement argument a questionable proposition. Tina Bailes, Deputy Commissioner of Finance and Administration for BMS, stated in her deposition that while administrative review is available for final cost settlements (which are initiated by BMS), there is no administrative review process for tentative cost settlements (which may be requested by health centers prior to final cost settlement). (Docket 50-1 at 31.) Thus, BMS controls the availability of state administrative review, and the agency has effectively foreclosed the opportunity for review of fiscal years 2004 to present. The Court finds it problematic that BMS now argues that this suit cannot proceed because the plaintiffs have failed to pursue the very administrative remedies BMS has foreclosed by its inaction. Moreover, Plaintiffs and BMS have been involved in a sustained and somewhat hostile dialogue about their disagreements for several years. Although the exchanges and negotiations certainly do not amount to a formal administrative proceeding, they illustrate BMS's awareness of Plaintiffs' allegations and the opportunity for the agency to act if BMS believed action was necessary. Little or nothing has changed over the course of the exchanges.

(2)   *Hardship*

Second, BMS argues that under the second prong of *Abbott Labs.*,[7] "delayed review would not cause hardship to Plaintiffs because they are being paid temporary settlements on their cost reports 'as filed' (pending final reconciliation and they are guaranteed their BIPA rate at final settlement)." (Docket 41 at 13.) However, BMS has not engaged in "final reconciliation" or final cost settlement for what appears to be eight or more years for some plaintiffs. In addition, BMS fails

---

[7] The hardship prong is measured "by the immediacy of the threat and the burden imposed on the petitioner." *Charter Fed. Sav. Bank*, 976 F.2d at 208 (citing *Abbott Labs.*, 387 U.S. at 149, 153).

to mention the affidavits that are attached to Plaintiffs' motion for preliminary injunction, in which they state that gross underpayment is resulting in salary freezes, lack of staff, and outdated equipment.[8]  It is also worth noting that because retroactive monetary relief is unavailable in this case,[9] the FQHCs may be losing money every day that cannot be recouped except by BMS voluntarily engaging in retroactive cost settlements (an unlikely result) or pursuing agency appeals once final cost settlements are actually performed.  BMS's second argument is unpersuasive.

### (3)     Federalism

BMS's final argument is that "'basic notions of federalism and comity counsel that the state system should first make a final determination' as to each Plaintiff's cost reimbursement before this federal court intervenes." (Docket 41 at 13.)  As stated previously, BMS has taken no action during the course of the dialogue between the parties, eight years of final cost settlements are incomplete,[10] and there is no indication that final cost settlements will take place other than BMS's statement that it is now ready to settle for some of the outstanding years.  Although Medicaid is administered by the State, it is governed by federal law.  Plaintiffs are alleging that West Virginia fails to meet the standards set forth in that federal law in a number of ways and that the State has been unresponsive

---

[8] Those affidavits cite rather large differences in the BIPA PPS rates calculated by the plaintiffs and BMS—for example, Docket 11-1 states that BMS has calculated a BIPA PPS rate of $81.74 per visit for one of the plaintiffs, but the plaintiff has calculated a BIPA PPS rate of $119.98.  The discrepancy in that particular case amounts to a PPS rate that is less than allegedly proper by one-third.  Although the affidavits are somewhat sparse on detail, see infra, the Court believes they suffice under the ripeness analysis.

[9] See infra.

[10] This allegation is corroborated by several internal BMS emails that the plaintiffs attached as exhibits to their motion.  (See, e.g., Docket 50-4 at 11.)

15

to their concerns for a prolonged period of time.  For these reasons, the Court believes federal action is warranted and this case is ripe for federal judicial review.

B.      *Retroactive Money Damages*

In its motion to dismiss, BMS also argues that "plaintiffs' relief, if any, is limited to prospective relief only, because as this case was filed in federal court, retroactive damages are barred by the Eleventh Amendment of the United States Constitution."  (Docket 41 at 13-14.)  This is a true statement of binding precedent, and retroactive monetary damages against West Virginia or its agencies are not available in this federal lawsuit.  *See Edelman v. Jordan*, 415 U.S. 651, 677-78 (1974) (Eleventh Amendment bars retrospective monetary relief against a State).  Plaintiffs respond that they agree and "seek . . . to change BMS's payment practices from the date of an injunction going forward," a prospective remedy.  (Docket 53 at 31-32.)  In a later filed motion to amend the complaint, Plaintiffs eliminate from their prayer the following language:

> Directing defendants to complete the reconciliation process for the plaintiff health centers for the years 2001 through 2010, and in so doing, re-calculate each center's per-visit rate for each year without the imposition of improper upper payment limits or productivity screens, and include full per-visit payment rates for dental and behavioral health visits, and pay to each plaintiff the difference (if any) between what was previously paid as a "tentative" settlement and what the health center should have received . . . .

(Docket 66 at 3 (strikeout indicates proposed amendment).)  Despite the parties' apparent agreement on this issue, BMS opposes the motion to amend the complaint, stating, in part, that other portions of the complaint still refer to re-calculating proper BIPA PPS rates, and arguing that such relief implies retroactive monetary damages against the State.  (Docket 67 at 7.)

To be clear, recalculating the BIPA PPS rates does not imply retroactive monetary relief; it simply acknowledges that prospective payments are derived from the mean of an FQHC's 1999 and

16

2000 reasonable operating costs, inflated each year according to federal law. If the plaintiffs succeed in their challenge, then recalculating the original BIPA PPS rates is a necessary step to properly compensating them in the future. Therefore, this portion of Plaintiffs' motion to amend the complaint will be granted, *infra*. The Motion to Dismiss [Docket 40] is **DENIED**.

### III.  MOTION FOR PRELIMINARY INJUNCTION

#### A.    Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524-26 (4th Cir. 2003); *see also De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220-21 (1945). Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by "a clear showing" that, among other things, it is likely to succeed on the merits at trial. *Winter v. Natural Resources Defense Council, Inc.*, ___ U.S. ___, 129 S.Ct. 365, 376 (2008). In its recent opinion in *Winter*, the Supreme Court articulated clearly what must be shown to obtain a preliminary injunction, stating that the plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." 129 S.Ct. at 374. All four requirements must be satisfied. *Id.* In *Real Truth About Obama, Inc. v. FEC (RTAO)*, the Fourth Circuit acknowledged that *Winter* overruled prior circuit precedent that provided for a "sliding scale" approach to preliminary injunctions. *See generally* 575 F.3d 342, 346-47 (4th Cir. 2009). Each of the four requirements set forth in *Winter* must be independently satisfied in order for a preliminary injunction to issue.

B.    *Likelihood of Suffering Irreparable Injury*

In support of their motion, Plaintiffs argue that "BMS's chronic underpayments are a contributing cause of severe financial distress . . . adversely impacting both business operations, as well as patient care." (Docket 11 at 26.)  Preliminary injunctions are extraordinary interlocutory remedies that are granted in limited circumstances and then only sparingly.  "Mandatory preliminary injunctions [generally] do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980).  That is to say, "a mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003).  There appear to be two questions contained in the irreparable harm prong: (1) whether the plaintiff is indeed suffering concrete and immediate harm; and (2) whether that harm is truly irreparable, or whether it can be remedied at a later time with money damages.  *See, e.g.*, *Sterling Commercial Credit—Mich., LLC v. Phoenix Indus. I, LLC*, 762 F. Supp 2d 8, 14-15 (D.D.C. 2011) ("First, the injury must be both certain and great; it must be actual and not theoretical. . . .  Second, the injury must be beyond remediation.").

(1)    *Concrete and Immediate Harm*

The concrete and immediate harm inquiry involves the affidavits submitted in conjunction with the motion for preliminary injunction, and it turns essentially on whether Plaintiffs have come forward with enough evidence to demonstrate that BMS's allegedly unlawful practices are resulting in underpayments to the FQHCs.  The affidavits state that BMS is failing to include a substantial

18

number of services in Plaintiffs' BIPA PPS rates, which results in the PPS rates being artificially depressed.  If true, the result is to undercut the centers' BIPA PPS rates, which are intended to operate as a floor payment to which FQHCs are always entitled.  If Plaintiffs' allegations are correct, BMS would also be unable to properly settle with FQHCs, because the agency would utilize a depressed floor rate.

However, despite these allegations, the affidavits and attached exhibits are remarkably devoid of a plain statement that the FQHCs currently receive less from BMS, *regardless of payment method*, than the reimbursement amount to which they are entitled under federal law.  The affidavits make it seem as though the FQHCs are not being reimbursed at all for Medicaid-covered services that BMS (allegedly unlawfully) fails to include in their BIPA PPS rates, but that is not true.  In fact, the FQHCs receive a fee for service rate (FFS), just like all other Medicaid providers in the State, for those other services.[11] [12]   Further, it may be the case that receiving (1) the APM rate for some

---

[11]   So, for example, BMS does not include dental services in the BIPA PPS rate, but FQHCs receive a fee-for service payment based on the cost of rendering dental services, as provided for in the State Medicaid Plan (as any dentist rendering dental services to a West Virginia Medicaid enrollee would receive).

[12]   The following is from the deposition of Kent Hill, Director of Provider Rate Development in the Finance and Operations department of BMS:

> Q:   Okay.  So I know the Medicare Cost Report has many pages and it's rather complicated, but end of the report, Medicare comes up with a per visit rate for the health center based on the above the line costs, is that right?
> A:   Yes, it does.  That's the cost per visit rate.
> Q:   Okay.  And BMS uses that same cost per visit?
> A:   For the FQHC core services, that's correct.
> Q:   Okay.  So if the FQHC has costs below the line, they will be on the cost report but they won't be in the per visit rate, is that correct?
> A:   That is correct.
> Q:   That's how the cost report works, right?

(continued...)

19

services ("FQHC core services") plus (2) FFS rates for other Medicaid-covered services ("other ambulatory services") results in a higher (or substantially similar) payment to the FQHCs, in which case Plaintiffs are not experiencing financial harm, regardless of the legality of BMS's actions. BMS half argues this point in its briefing, stating that FQHCs are receiving lump interim payments that approximate what their allegedly "properly calculated" BIPA PPS rate would be, regardless of under what methodology those payments are being made.  Further, the plaintiffs acknowledge this argument, albeit briefly:

> Defendants also argue that plaintiffs are not harmed because for the "other ambulatory services" that fall outside the "core" Medicare definition, they do get paid, it is just at a fee-for service rate rather than at the per-visit rate required by BIPA. But this is in fact harm, as those fee-for-service rates do not cover the plaintiffs' costs of providing those services, and this is sharply restricting their ability to offer the services to their patients who need them.

(Docket 53 at 24-25.)   Notably, in the above excerpt, Plaintiffs do not state that the "mixed method"[13] that BMS employs is falling short of their properly-calculated BIPA PPS rate.  Instead, Plaintiffs state that the mixed method does not cover the costs of providing services—which is not

---

[12](...continued)

> A:    Exactly.  And that's not to say that those aren't reimbursable costs, don't get me wrong.  Those are, in fact FQHC services and they can be reimbursed.  Medicare, of course, like I indicated earlier, pays, through BMS, a fee for service on these, as well as West Virginia Medicaid pays on a fee for service on those [below the line or "other ambulatory"] services.

(Docket 50-2 at 15.)

[13]  This is the Court's own term.  It refers to BMS's practice of paying "above the line" or "FQHC core services" under a PPS rate and all other Medicaid-covered services at an individualized FFS rate.

a guarantee, even for the BIPA PPS rate.  Nonetheless, Plaintiffs appear to be maintaining that they are being unlawfully harmed by BMS's payment practices.

The affidavits also contain exhibits setting forth each plaintiff's alleged total underpayments for each year.  An explanatory footnote states that the annual underpayments were "[c]alculated by multiplying [the] properly calculated PPS rate by [the] number of medical, dental and behavioral health visits for [the] year and subtracting the amount paid by BMS that year."[14]  (*E.g.*, Docket 11-1 at 15.)  It appears from this statement that Plaintiffs are indeed calculating the compensation they allegedly should be receiving as a statutory floor (BIPA PPS rate times number of qualifying visits), and then subtracting the total payments actually received by a given health center from BMS in a particular year.  The resultant figure would demonstrate that payments received are falling below the BIPA PPS floor, as calculated by Plaintiffs.  However, it is not entirely clear whether the exhibits account for the FFS payments the health centers receive at all, which is necessary to successfully demonstrate harm.  BMS has not directly challenged the affidavits as defective in demonstrating a shortfall on this point, however, simply stating that "an FQHC can request a temporary settlement based on its cost report" and "plaintiffs are receiving payments for non-FQHC Medicaid-covered services (based on fee-for-service)."  (Docket 41 at 15.)  Nonetheless, the Court is wary of entering a mandatory preliminary injunction based on such scant evidence supporting harm to Plaintiffs—a finding which would rely on a favorable interpretation of ambiguous footnotes in exhibits attached to the preliminary injunction motion.

A careful look at the affidavits and attached exhibits, therefore, reveals that Plaintiffs primarily focus on the disparity between the BIPA PPS or APM  rates as they have calculated the

---

[14]  Each affidavit also produces similar calculations using the APM rate.

rates versus the rates as calculated by BMS.  There is no mention of any FFS payments the FQHCs receive for other Medicaid services, which BMS maintains may be paid outside the per-visit methodology.  In short, the FQHCs are receiving per-visit payments (under the APM) for some services and FFS payments for other services, and the Court is unable to determine whether the "total underpayment for year" figures in the affidavit charts include the FFS payments or not.  The Court must conclude, therefore, that the plaintiffs have failed to clearly demonstrate that they are likely to suffer harm in the absence of preliminary relief.  *See RTAO*, 575 F.3d at 346-47.  Accordingly, the Motion for Preliminary Injunction [Docket 8] will be **DENIED WITHOUT PREJUDICE**.

*(2)      Irreparable Injury or Harm*

An irreparable injury is one that cannot adequately be compensated for either by a later-issued permanent injunction or by a later-issued damages remedy.  *See Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005)(citing Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 11A *Federal Practice & Proc.* § 2948.1 (2d ed. 1995)); *see also Leatherwood v. Cohen*, No. 2:10-cv-1593-RBH-RSC, 2010 WL 4721132, at *1 (D.S.C. Oct. 13, 2010) ("Irreparable harm is defined as an injury for which a monetary award cannot be adequate compensation.") (internal quotations and citation omitted).

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).   Irreparable harm is measured in terms of the harm

arising during the interim between the request for an injunction and the final disposition of the case on the merits. *E.g.*, *Jayaraj v. Scappini*, 66 F.3d 36 (2d Cir. 1995). The Fourth Circuit has recognized that "irreparability of harm [also] includes 'impossibility of ascertaining with any accuracy the extent of the loss.'" *Merrill Lynch Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985).

In short, the requirement is that "[a] plaintiff seeking a preliminary injunction . . . establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 21; *see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) ("[T]he party requesting preliminary relief must make a 'clear showing' that he will suffer irreparable harm if the court denies his request."); C. Wright, A. Miller, & M. Kane, 11A *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) (applicant must demonstrate that in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered"). Absent special circumstances, economic damages generally will not suffice to demonstrate irreparable injury. *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995) (citing *Sampson v. Murray*, 415 U.S. at 90); *see also Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir. 1993) (upholding district court finding that "loss of distributor agreements, loss of sales, expenses incurred in relocation, injury to reputation, loss of profits, and loss of volume discounts" were not irreparable injuries); *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981) (emphasizing that economic losses threatened the very existence of plaintiff's business in finding irreparable injury). Even if a loss can be compensated by money damages at judgment, however, extraordinary circumstances may give rise to the irreparable harm required for a preliminary injunction. For

23

example, the Seventh Circuit has noted that even where a harm could be remedied by money damages at judgment, irreparable harm may still exist where the moving party's business cannot survive absent a preliminary injunction or where "[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 206 (3d Cir. 1990) (holding that "the unsatisfiability of a money judgment can constitute irreparable injury").

In their memorandum, Plaintiffs argue:

> Critically, although plaintiffs seek back payments in this litigation, monetary relief at some undetermined future point will not compensate them for the present effects of BMS's underpayments, namely: the curtailment of services, the deferral of maintenance and upgrading equipment, and the freezing and cutting of staff salaries and benefits, to name just a few examples. In this Circuit, "irreparable injury is suffered when monetary damages are . . . inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994). Here, although back payments can compensate plaintiffs for lost revenue, money is inadequate to cure the present ripple effect caused by that lost revenue.

(Docket 11 at 26.) In addition, Plaintiffs essentially argue that irreparable injury results to their patients as a result of curtailing services and freezing or cutting salaries.

Plaintiffs are alleging economic harm and curtailed services to Medicaid patients as a result. The Court perceives nothing special about such economic harm. "[C]urtailment of services, the deferral of maintenance and upgrading equipment, and the freezing and cutting of staff salaries and benefits" are all fairly standard consequences of business injury. Plaintiffs' further argument that being denied full compensation now has a ripple effect for future earnings is likewise unavailing because it is indistinguishable from standard business harm. If cutting salaries and curtailing services constitutes irreparable harm, it is difficult to perceive a circumstance under which business

24

harm is not irreparable. The fact that Plaintiffs are involved in the provision of health care services certainly effects the public interest prong of the preliminary injunction analysis, but it does not automatically transform standard business loss into irreparable harm.

Plaintiffs rely on a similar case from the First Circuit, in which FQHCs sued Puerto Rico for failing to make sufficient MCO "wrap around payments" as required by federal Medicaid law. *See generally Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005). In finding irreparable harm to the plaintiffs in that case, the First Circuit emphasized that the plaintiffs produced an accountant who testified that they were 8 or 9 months behind on their mortgage and that foreclosure proceedings were about to commence. *Id.* at 76. No similarly immediate and irreparable monetary harm has been demonstrated in this case.

Although neither party has argued it to the Court, the Eleventh Amendment's bar on retroactive monetary damages against the State or its agencies may impact the irreparable harm element of the preliminary injunction analysis. In particular, the unavailability of past money damages in federal court may warrant preliminary relief if harm is more adequately demonstrated, even despite the availability of other avenues for similar relief in state courts or before state agencies. *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009) ("[A]lthough damages may become available to the Hospital Plaintiffs in state court, persuasive authority suggests that federal courts may consider only what federal remedies are available."). *But see Kan. Health Care Ass'n*, 31 F.3d at 1543 ("Because the Eleventh Amendment bars a legal remedy in damages, and the court concluded no adequate state administrative remedy existed, the court held that plaintiffs' injury was irreparable. We agree." (emphasis added)). If a renewed motion for preliminary injunction is filed, the parties are asked to address whether the Court may consider

25

the availability of state remedies in determining the appropriateness of ordering preliminary relief in this case.

## IV.  MOTIONS TO AMEND

### A.    Legal Standard

Rule 15(a) permits amendment of a complaint "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  The decision to grant leave to amend a pleading is within the sound discretion of the district court, but that discretion is limited by the general policy of favoring the resolution of cases on the merits.  *See Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006) (en banc).  "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile."  *Sciolino v. Newport News, Va.*, 480 F.3d 642, 651 (4th Cir. 2007) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir.1986)).  "Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing."  *Laber,* 438 at 427.  The party who opposes the amendment bears the burden of showing prejudice. *Mulvey Const., Inc. v. Bituminous Cas. Corp*., No. 1:07–0634, 2011 WL 1231603, at *2 (S.D. W. Va. Mar. 30, 2011).

### B.    Analysis

BMS comes forward with no reason that permitting amendment would be prejudicial to any party, notwithstanding the nuisance of defending a lawsuit generally.  (Docket 67 at 6 ("It would be prejudicial to Governor Tomblin to require him to appear and defend the claim against him.").)  Likewise, BMS cannot demonstrate bad faith by the plaintiffs in seeking the amendment.  In fact, the motion to amend the complaint was spurred by issues raised in the motions hearing, and the

plaintiffs are merely reacting to assertions made by BMS in that hearing.  Therefore, only insofar as amendment would be futile does the Court address BMS's arguments.

BMS first claims that the proposed amendments are futile because "[t]hey do not cure the subject matter jurisdiction defects."  (Docket 67 at 4.)  As explained above, no such defects exist in this case, and the proposed amendments are not futile for this reason.  Second, BMS argues that the addition of Governor Tomblin is futile because he enjoys absolute legislative immunity when exercising legislative power, and his joinder to this suit would therefore be futile.  The parties have indicated that BMS must send any State Plan amendments to the governor or his designee prior to submitting them to the federal government and that BMS must "provide opportunity for the Office of the Governor to review State Plan amendments."  (Docket 68 at 4.)  At this time, it is unclear to the Court whether Governor Tomblin is necessary to whatever final relief may be fashioned in this case.  It is certainly conceivable that the Court would place time restrictions on the State to propose an amendment to the State Plan,[15] in which case the governor—who appears to be a necessary step in the State Plan proposal process—may be a proper defendant.  On the record as it stands, the Court must conclude that BMS has failed to demonstrate that adding the Governor of West Virginia to this suit would be futile.  The acting Governor may, of course, move to dismiss the complaint against him at a later date if he deems it desirable.

Finally, BMS argues that it would be futile to permit amendment of Plaintiffs' prayer for relief, wherein Plaintiffs eliminate their request for retroactive money damages.  The Court has

---

[15]  BMS argues that "the Court does not have jurisdiction to re-write the State plan because that would require the Court to exercise discretion in the administration of the State plan in violation of the Medicaid Act and the Separation of Powers Doctrine."  (Docket 67 at 5.)  The Court has no intention of usurping West Virginia's sovereign right to develop and implement a State Medicaid Plan of its own design.

already addressed this argument and held that because recalculating the original BIPA PPS rates is a necessary step to properly compensating the plaintiffs in the future, the motion is **GRANTED** on this issue.  On the whole, BMS's opposition to Plaintiffs' motion to amend is a waste of the litigants' and the Court's resources.  The proposed amendments largely concern agreed upon issues of law and minor, technical changes, none of which warrant a response.  As to the addition of defendants, BMS fails to carry its burden of demonstrating futility, which should have been apparent from the outset.

Plaintiffs are therefore **GRANTED** leave to amend their complaint as sought in the second Motion to Amend [Docket 65].  Plaintiffs' motion to withdraw the original motion to amend [Docket 62] is also **GRANTED**.

*V.  CONCLUSION*

Plaintiffs' second Motion for Leave to Amend the Complaint [Docket 65] is **GRANTED**.  BMS's Motion to Dismiss the Complaint [Docket 40] is **DENIED**.  Plaintiffs' Motion for Preliminary Injunction [Docket 8] is **DENIED WITHOUT PREJUDICE** for failing to clearly demonstrate harm.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      September 28, 2011

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

28